ACCEPTED
03-15-00226-CV
6505541
THIRD COURT OF APPEALS
AUSTIN, TEXAS
8/14/2015 2:26:54 PM
JEFFREY D. KYLE
CLERK

CASE NO. 03-15-00226-CV

IN THE COURT OF APPEALS
FOR THE THIRD JUDICIAL DISTRICT
AT AUSTIN, TEXAS

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
8/14/2015 2:26:54 PM
JEFFREY D. KYLE
Clerk

Texas Health & Human Services Commission,
Appellant,
v.
Linda Puglisi,
Appellee.

On Appeal from Cause No. D-1-GN-14-000381
53rd Judicial District Court of Travis County, Texas
Honorable Judge Gisela D. Triana Presiding.

APPELLANT'S REPLY BRIEF

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for
Civil Litigation

DAVID A. TALBOT, JR.
Chief, Administrative Law
Division

EUGENE A. CLAYBORN
State Bar No.: 00785767
Assistant Attorney General
Deputy Chief, Administrative Law Division
OFFICE OF THE ATTORNEY GENERAL OF TEXAS
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: (512) 475-3204
Facsimile:  (512) 320-0167
eugene.clayborn@texasattorneygeneral.gov

*Attorneys for Texas Health and
Human Services Commission*

ORAL ARGUMENT REQUESTED                    August 14, 2015

# Table of Contents

Table of Contents ................................................................................................... ii

Table of Authorities ............................................................................................. iii

I.     ARGUMENT AND AUTHORITIES .............................................................. 1

     A.    Puglisi's definition for *covered* DME is misleading. ............................ 1

     B.    Puglisi requires maximum assistance from her caregivers for all activities of daily living. ...................................................................... 3

     C.    Compliance with Tex. Hum. Res. Code §§ 32.04242, 32.050(b) ........... 4

     D.    Puglisi subverts the substantial evidence review standard. .................... 6

     E.    *Detgen* is controlling authority regarding HHSC's categorical exclusion of mobile standers based on the availability of a cost-effective alternative. ................................................................................ 7

     F.    Puglisi received adequate due process. ............................................... 11

II.    CONCLUSION ........................................................................................... 11

PRAYER ............................................................................................................. 12

CERTIFICATE OF COMPLIANCE ................................................................... 13

CERTIFICATE OF SERVICE .......................................................................... 14

APPENDICES .................................................................................................... 15

# Table of Authorities

**Cases**

*City of El Paso v. Pub. Util. Comm'n*,
  883 S.W.2d 179 (Tex. 1994) ...................................................................................6

*DeSario v. Thomas*,
  139 F.3d 80 (2nd Cir. 1998) ...............................................................................3, 5

*Detgen ex. rel. Detgen v. Janek*,
  752 F.3d 627 (5th Cir. 2014) ....................................................................... 8, 9, 10

*Lavine v. Milne*,
  424 U.S. (1976) .......................................................................................................6

*Slekis v. Thomas*,
  525 U.S. 1098 S.Ct. 864 L.Ed.2d 767 (1998) .......................................................6

*Tex. Health Facilities Comm'n v. Charter Med.-Dall.*,
  665 S.W.2d 446 (Tex. 1984) ..................................................................................6

*Tex. Rivers Prot. Ass'n v. Tex. Natural Res. Conservation Comm'n*,
  910 S.W.2d 147 (Tex. App.—Austin 1995, writ denied) ......................................6

*Univ. of Tex. Med. Sch. at Houston v. Than*,
  901 S.W.2d 926 (Tex. 1995) ................................................................................11


**Statutes**
Texas Government Code
  § 2001.175 .............................................................................................................12


**Rules**

1 Tex. Admin. Code
  § 354.1039(a)(4)(D) ...............................................................................................8
  § 354.1041 ..................................................................................................... 4, 5, 6

Tex. Hum. Res. Code
  §§ 32.04242, .050(b) ................................................................... 4, 5, 6


**Other Authorities**
42 C.F.R.
  Part 431 Subpart E .........................................................................9

TMPPM
  § 2.2.14.22 ....................................................................................8
  § 2.2.14.26 .................................................................................8, 9
  § 2.3.1.2 ........................................................................................5
  § 2.3.1.3 ........................................................................................5


Fed. Reg.
  Vol. 76, No. 133, Tuesday, July 12, 2011, Page 41032 ........................................3

CASE NO. 03-15-00226-CV

IN THE COURT OF APPEALS
FOR THE THIRD JUDICIAL DISTRICT
AT AUSTIN, TEXAS

Texas Health & Human Services Commission,
Appellant,
v.
Linda Puglisi,
Appellee.

On Appeal from Cause No. D-1-GN-14-000381
53rd Judicial District Court of Travis County, Texas,
Honorable Judge Gisela D. Triana Presiding.

APPELLANT'S REPLY BRIEF

TO THE HONORABLE JUDGE OF THIS COURT:

COMES NOW the Texas Health and Human Services Commission (HHSC)

and submits Appellant's Reply Brief.

## I.     ARGUMENT AND AUTHORITIES

### A.     Puglisi's definition for *covered* DME is misleading.

Puglisi erroneously alleges that "[a]n item of medical equipment is covered if

it meet HHSC's definition of DME."   Br. of Appellee, p. 3.   Puglisi's definition of

*covered* DME, however, is derived from her fundamental misreading of the May 21,

2013 CMS letter.   Br. of Appellee; App. 1.   The May 21, 2013 CMS letter states

that "[a]s such, items of DME meeting *the state's definition of such coverage* is to

1

be provided to individuals (of any age) meeting the State's medical necessity criteria." (emphasis added). Br. of Appellee; App. p. 1. This statement shows that an item defined as DME may or may not meet the State's definition of *covered* DME.

In fact, there is no dispute about whether any of Puglisi's requested items are defined as DME. The facts are that the power wheel chair, the integrated standing feature, and the power seat system are all defined as DME. Similarly, there is no dispute about which of Puglisi' requested items are covered. The facts are that the power wheelchair and the power seat system are covered DME. However, the integrated standing feature is not covered. However, the parties dispute whether the requested items are medically necessary since the items do not facilitate any additional MRADLs activities.

Despite these immutable facts, Puglisi asserts that the integrated standing feature should be *covered* DME solely because it satisfies the definition of DME. But the definition of *covered* DME is determined by the process and procedures prescribed in applicable statutes, rules, and policies. Appellant's Br. App. 4, 5. In essence, Puglisi's improperly conflates the definition of DME and the definition of *covered* DME in order to reach an erroneous conclusion. As a result, Puglisi cannot rely solely on the definition of DME to determine whether certain DME is *covered* DME or not. "There is no requirement that a state fund every medically necessary procedure or item falling within a service it covers under its plan. To begin with,

2

medical necessity and coverage are distinct concepts; a patient's medical necessity does not determine whether a particular item or service is covered." *DeSario v. Thomas*, 139 F.3d 80 (2nd Cir. 1998).

In addition, the May 21, 2013 CMS letter also states that its "Notice of Proposed Rulemaking issued July 12, 2011" include proposals that define "a medical supply, equipment, and appliance" and also provide "that any item meeting any of those definitions must be covered under the state plan.…". Br. of Appellee; App. 1. It is true that CMS published proposed policy changes and clarifications to certain Home Health Services, however, CMS's proposals have not been formally adopted. Fed. Reg. Vol. 76, No. 133, Tuesday, July 12, 2011, Page 41032; Appellant's Reply Br.; App. p. 13. Regardless, nothing in the proposed changes appears to restrict the HHSC's authority to define the scope of coverage for Medicaid DME.

**B.     Puglisi requires maximum assistance from her caregivers for all activities of daily living.**

Puglisi states that "[s]he requires a custom power wheelchair for all mobility." Br. of Appellee, p. 5. Based on statements of Molina Healthcare's Rehab Review, Nurse Review, and Medical Doctor Review, however, the Hearing Officer determined the following:

On or about June 4, 2013, Molina Healthcare forwarded the DME request to Rehab Review for a third party review for medical necessity of the DME requested. Rehab Review is a Rehabilitation Engineering and Assistive Technology Society (RESNA) certified entity contracted to conduct independent reviews for medical necessity of DME.

. . . .

Appellant requires maximum assistance with all activities of daily living including transfers. Appellant requires caregiver assistance to transfer in and out of her bed and wheelchair.

Molina healthcare recommended approval of a group 3 power wheelchair with a stand-alone dynamic stander to meet the Appellant's needs; however Appellant is unable to transfer independently and would require assistance from one or two caregivers to transfer to the dynamic stander.

A.R. at 334. In short, Puglisi needs maximum assistance from her caregivers for all MRADLs with or without a power wheelchair, integrated standing feature, or power seat elevation system. Therefore, a group 4 custom power wheelchair with an integrated mobile stander is not medically necessary to correct or ameliorate Puglisi's disability, condition, or illness, given that her caregivers must assist her with transfers, feeding, and dressing.

**C.     Compliance with Tex. Hum. Res. Code §§ 32.04242, 32.050(b) and Tex. Admin. Code § 354.1041 is important.**

Puglisi states that "[i]t does not matter that 'Texas law requires HHSC to analyze claims submitted first under Medicare the extent allowed by law.'" Br. of Appellee p. 12. Also, Puglisi states that this case is not about the payment of claims." Br. of Appellee, p. 12. Further, Puglisi states that "Medicare's primary

4

payor status does not dictate any particular order for securing prior authorization of the recommended wheelchair." Br. of Appellee, p. 12. However, compliance with Tex. Hum. Res. Code §§ 32.04242, .050(b) and 1 Tex. Admin. Code § 354.1041 is important. To a state agency, compliance with the law cannot be so easily disregarded.

On the one hand, absent a clear delegation of authority, it is nonsensical to expect a state Medicaid program to provide prior authorizations of DME for a Federal Medicare program and vice versa. On the other hand, TMPPM § 2.3.1.2 (Benefits for Medicare/Medicaid Clients) provides that "[f]or eligible Medicare/Medicaid clients, Medicare is the primary coinsurance and providers must *contact Medicare first for prior authorization and reimbursement*." (emphasis added). Appendix 14. Further, TMPPM § 2.3.1.3 (Medicare and Medicaid Prior Authorization) provides that *"[f]or MQMB clients, do not submit prior authorization requests to TMHP if the Medicare denial reason states 'not medically necessary.' Medicaid only will consider prior authorization requests if the Medicare denial states 'not a benefit of Medicare.'"* Appellant's Reply Br.; Appendix 14. Hence, Puglisi's MQMB status is a significant intervening event that renders the underlying issues of this suit unfit for judicial review because applicable law and policy requires her to present her prior authorization to Medicare before presenting her request to HHSC. *See DeSario v. Thomas*, 139 F.3d 80, 96 (2nd Cir.

5

1998), *cert. granted, judgment vacated*, *Slekis v. Thomas*, 525 U.S. 1098, 119 S.Ct. 864, 142 L.Ed.2d 767 (1998) ("In general, the 'normal assumption [is] that an applicant is not entitled to benefits unless and until he proves his eligibility.'" (Quoting *Lavine v. Milne*, 424 U.S. (1976)). Therefore, compliance with Tex. Hum. Res. Code §§ 32.04242, .050(b) and 1 Tex. Admin. Code § 354.1041 is an essential prerequisite to seeking prior authorization or reimbursement from Medicaid.

**D.    Puglisi subverts the substantial evidence review standard.**

The trial court erred by ignoring the substantial evidence review standard and the proper burden of proof. In this suit for judicial review, Puglisi has the burden of proof. "[F]indings, inferences, conclusions, and decisions of an administrative agency are presumed to be supported by substantial evidence, and the burden is on the contestant to prove otherwise." *City of El Paso v. Pub. Util. Comm'n*, 883 S.W.2d 179, 185 (Tex. 1994) (citing *Tex. Health Facilities Comm'n v. Charter Med.-Dall.*, 665 S.W.2d 446, 452–53 (Tex. 1984)). As long as a properly supported finding given in the order supports an agency's action, the court will uphold the action despite the existence of other findings that are irrelevant or unsupported by the record. *Tex. Rivers Prot. Ass'n v. Tex. Natural Res. Conservation Comm'n*, 910 S.W.2d 147, 155 (Tex. App.—Austin 1995, writ denied).

6

Puglisi makes several statements throughout her brief that demonstrate her failure to meet the burden of proof under the substantial evidence test. Br. of Appellee, p. 24-34. In one example, Puglisi states that "[t]he bottom line is that the administrative record contains no credible evidence refuting the professional opinions of Linda's medical providers." Br. of Appellee, p. 31. This statement, however, follows several pages of argument dedicated to discounting the evidence in the record that supports the findings and conclusions contained in the orders upholding Molina's decision. The bottom line is that there is more than a mere scintilla of evidence in the record to support the Hearing Officer's and the Reviewing Attorney's findings and conclusions. Appellant's Br. p. 16-44.

**E.** ***Detgen* is controlling authority regarding HHSC's categorical exclusion of mobile standers based on the availability of a cost-effective alternative.**

Puglisi asserts that "TMHP's policy excluding wheelchair standing features from Medicaid coverage …, is an invalid basis for HHSC's decision" and that "TMHP's exclusion of wheelchair standing features meets all of the criteria of a 'rule' identified in the Texas Administrative Procedures Act (APA), but was not promulgated in compliance with the Act." Br. of Appellee, p. 40-41. These assertions fail because HHSC is not prohibited from categorically excluding certain types of DME and Puglisi cannot claim a private right to DME that has been categorically excluded from Medicaid coverage.

7

In fact, Puglisi fails to assert a private right to a mobile stander in her legal analysis alleging how TMPPM § 2.2.14.26 is a rule. The most that Puglisi could possibly claim is a right to exceptional circumstances review because mobile standers are categorically excluded from Medicaid coverage. Exceptional circumstances review applies to unlisted DME. *See* 1 TAC § 354.1039(a)(4)(D). However, Puglisi never requested exceptional circumstances review.

In this case, TMPPM § 2.2.14.22 provides a less costly, yet equally effective alternative to the categorically excluded mobile power stander. Appellant's Br. App. 5, DM-78. As to the reasonableness of HHSC's categorical exclusion of certain DME (i.e. ceiling lifts), the Fifth Circuit recently stated the following:

> It is hardly unreasonable for a state to exclude—even categorically—any medical device whose purpose can be served by a more cost-effective method. Not only has Texas not violated the plain language of the statute, but also the reasonableness standard in the text likely supports its imposition of reasonable categorical exclusions. The plaintiffs' notion that it would be unreasonable for a state not to provide particular equipment within its definition of DME sounds plausible, except that the state can choose by definition to exclude ceiling lifts. FN6. Moreover, a categorical exclusion based on the availability of cost-effective alternatives cannot mean that the state has denied a medically necessary device, even if the statute did impose such a standard.

*Detgen ex. rel. Detgen v. Janek*, 752 F.3d 627, 632 (5th Cir. 2014) (Medicaid recipient brought suit against HHSC challenging the denial of their request for the installation of ceiling lifts to transfer the recipient to and from bed, bath, etc.). Appellant's Br. App. 8.

Nevertheless, Puglisi asserts that *Detgen* is "wrong." Br. of App. p. 36. TMPPM § 2.2.14.26, however, does not violate federal and state Medicaid requirements because "[a] State may develop a list of pre-approved items of ME [Medical Equipment] as an *administrative convenience* because such a list eliminates the need to administer an extensive application process for each ME request submitted." (emphasis added*)*. CMS letter dated September 4, 1998; Appellant's Brief; Appendix 6. Moreover, CMS guidance provides that:

> . . . [A] State will be in compliance with federal Medicaid requirements only if, with respect to an individual applicant's request for an item of ME, the following conditions are met:
>
> • The process is timely and employs reasonable and specific criteria by which an individual item of ME will be judged for coverage under the State's home health services benefit. These criteria must be sufficiently specific to permit a determination of whether an item of ME that does not appear on a State's pre-approved list has been arbitrarily excluded from coverage based solely on a diagnosis, type of illness, or condition.
>
> • The State's process and criteria, as well as the State's pre-approved list of items, are made available to beneficiaries and the public.
>
> • Beneficiaries are informed of their right under 42 C.F.R. Part 431 Subpart E, to a fair hearing to determine whether an adverse decision is contrary to the law cited above.

CMS letter dated September 4, 1998; Appellant's Br. App. 6. In addition to the federal guidance described in the *DeSario Letter*, *Detgen v. Janek* provides that: "[t]he rule the court employs is this: where a State has explicit guidance from CMS

9

that FFP will not be available for an item of DME, that State acts reasonably when it categorically excludes such an item from coverage in its Medicaid policies." *Detgen ex. rel. Detgen v. Janek*, 945 F.Supp.2d 746, 759 (N. D. Tex. 2013) ("The court finds that Texas Medicaid's policy categorically excluding ceiling lifts from coverage does not conflict with the Medicaid Act's 'reasonable standards' requirement, the 'amount, duration, and scope' regulation, or the DeSario letter's guidance."). Appellant's Br. App. p. 12. Furthermore, recent CMS guidance provides that "items of DME meeting the state's definition of coverage is to be provided to individuals (of any age) meeting the State's medical necessity criteria." CMS letter dated May 21, 2013 ("This means that medically necessary ceiling lifts will be reimbursed by CMS as part of the Texas home health benefit if these lifts meet the state's definition of DME [coverage]." (emphasis added). A.R. at 303. Furthermore, *Detgen* states that"

> It would be perfectly consistent with federal law and this letter to adopt a list of pre-approved devices for convenience and a list of categorical exclusions if based on reasonable grounds, such as the availability of more cost-effective alternatives, and to permit a beneficiary to demonstrate need for an item on neither list. In short nothing in the *DeSario* letter prohibits categorical exclusions, which might even be eminently reasonable and thus consistent with the statutory language.

*Detgen ex. rel. Detgen v. Janek*, 752 F.3d 627, 633 (5th Cir. 2014); Appellant's Br. App. p. 8. HHSC's categorical exclusion of mobile standers, therefore, is consistent with state and federal statutes, rules, and guidance.

10

**F.     Puglisi received adequate due process.**

After Puglisi requested the DME, Molina reviewed, analyzed, and denied the request. HHSC reviewed and affirmed Molina's decision. The trial court judicially reviewed HHSC's decision. Now this Court is judicially reviewing the trial court's decision. Nevertheless, Puglisi is alleging a denial of due process even though she has participated in hearings at multiple levels of administrative and judicial review. Her experiences before the administrative and judicial tribunals define adequate due process. If this Court concludes that Puglisi is entitled to more due process, the clear solution is to remand this case back to Molina and begin due process anew. *See Univ. of Tex. Med. Sch. at Houston v. Than*, 901 S.W.2d 926 (Tex. 1995) ("In general, the remedy for a denial of due process is due process.").

## II.     CONCLUSION

This case should have been dismissed for lack of subject matter jurisdiction or remanded to the agency to take and adjudicate additional evidence regarding Puglisi's dual eligibility status. Regardless, substantial evidence supports the Hearing Officer and Reviewing Attorney findings and conclusions. Moreover, Molina, the Hearing Officer, and the Reviewing Attorney properly interpreted and applied agency rules, policies, and procedures. In the final analysis, Puglisi has received all the process that she was due.

**PRAYER**

WHEREFORE, PREMISES CONSIDERED, Appellant respectfully asks that this Court: a) reverse the trial court and dismiss this suit for lack of subject matter jurisdiction; b) reverse the trial court and render judgment in favor of HHSC because Molina Healthcare's and HHSC's decisions are supported by substantial evidence; or c) reverse the trial court and remand the case to Molina Healthcare and HHSC to take additional evidence pursuant to Texas Government Code § 2001.175, to allow Puglisi the opportunity to seek prior authorization from Medicare, and to allow Puglisi the opportunity to request exceptional circumstances review.

Respectfully Submitted,

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for Litigation

DAVID A. TALBOT, JR.
Chief, Administrative Law Division

/s/ Eugene A. Clayborn
EUGENE A. CLAYBORN
State Bar No.: 00785767
Assistant Attorney General
Deputy Chief, Administrative Law Division
OFFICE OF THE ATTORNEY GENERAL OF TEXAS
P.O. Box 12548, Capitol Station
Austin, Texas   78711-2548
Telephone:   (512) 475-3204
Facsimile:    (512) 320-0167
eugene.clayborn@texasattorneygeneral.gov

*Attorneys for Texas Health & Human Services Commission*


## CERTIFICATE OF COMPLIANCE

I certify that the reply brief submitted complies with Texas Rule of Appellate Procedure 9 and the word count of this document is 2,621.  The word processing software used to prepare this filing and calculate the word count of the document was Microsoft Word 97-2003.

Dated: August 14, 2015


/s/ Eugene A. Clayborn
EUGENE A. CLAYBORN
Assistant Attorney General

13

# CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served on this the 14th day of August, 2015 on the following:


Maureen O'Connell                    Via: *Electronic Service*
State Bar No.: 00795949
SOUTHERN DISABILITY LAW CENTER
1307 Payne Avenue
Austin, Texas 78757
moconnell458@gmail.com
**Attorneys for Appellee**


/s/ Eugene A. Clayborn
EUGENE A. CLAYBORN
Assistant Attorney General

CASE NO. 03-15-00226-CV

_____

IN THE COURT OF APPEALS
FOR THE THIRD JUDICIAL DISTRICT
AT AUSTIN, TEXAS

_____

Texas Health & Human Services Commission,
Appellant,
v.
Linda Puglisi,
Appellee.

_____

On Appeal from Cause No. D-1-GN-14-000381
53rd Judicial District Court of Travis County, Texas
Honorable Judge Gisela D. Triana Presiding.

_____

APPELLANT'S REPLY BRIEF

_____

## **APPENDICES**

No. 13.          Fed. Reg. Proposed Rules

No. 14.          TMPPM 2.3

15



## Center for Medicaid, CHIP, and Survey & Certification

## CMCS Informational Bulletin

**DATE:**     July 13, 2011

**FROM:**     Cindy Mann, Director
              Center for Medicaid, CHIP and Survey and & Certification (CMCS)

**SUBJECT:**  Updates on Medicaid/CHIP

This Informational Bulletin covers several important topics of interest to States:
- New Initiative for Medicare-Medicaid Enrollees;
- Proposed Regulations Regarding Affordable Insurance Exchanges
- Home Health Services NPRM;
- PRA Package for Medicaid and CHIP State Plan, Waiver, and Program Submissions;
- CMS Second National Background Check Program Conference;
- Inclusion of Training Costs in Rate Development:
- Pharmacy Pricing Survey

### New Initiative for Medicare-Medicaid Enrollees

CMCS and the Office of Medicare-Medicaid Coordination is pleased to announce the release of a State Medicaid Director's letter providing guidance on opportunities to test new financial models designed to help States improve quality and share in the lower costs that result from better coordinating care for individuals enrolled in both Medicare and Medicaid (Medicare-Medicaid enrollees).   A longstanding barrier to coordinating care for Medicare-Medicaid enrollees has been the financial misalignment between Medicare and Medicaid.  To address this, and in response to State requests CMS is eager to collaborate with States to test two models to better align the financing of these two programs and integrate primary, acute, behavioral health and long term services and supports for their Medicare-Medicaid enrollees.  We will be setting up calls with States to review these opportunities.

For more information, please visit:
https://www.cms.gov/smdl/downloads/Financial_Models_Supporting_Integrated_Care_SMD.pdf

### Proposed Regulations Regarding Affordable Insurance Exchanges

On July 11, 2011, CMS issued the a proposed rule setting forth a framework to assist States in building Affordable Insurance Exchanges, state-based competitive marketplaces where individuals and small businesses will be able to purchase affordable private health insurance. Starting in 2014, Exchanges will make it easy for individuals and small businesses to compare health plans, get answers to questions, find out if they are eligible for tax credits for private

**Appendix - 13**

insurance or health programs like Medicaid and the Children's Health Insurance Program (CHIP), and enroll in a health plan that meets their needs.

The proposed rules offer States guidance and options on how to structure their Exchanges in two key areas:

- Setting standards for establishing Exchanges, setting up a Small Business Health Options Program (SHOP), performing the basic functions of an Exchange, and certifying health plans for participation in the Exchange, and;

- Ensuring premium stability for plans and enrollees in the Exchange, especially in the early years as new people come in to Exchanges to shop for health insurance.

These proposed rules set minimum standards for Exchanges, give States the flexibility they need to design Exchanges that best fit their unique insurance markets, and are consistent with steps States have already taken to move forward with Exchanges. The proposed rules build on over a year's worth of work with States, small businesses, consumers and health insurance plans and offer States substantial flexibility. For example, it allows States to decide whether their Exchanges should be local, regional, or operated by a non-profit organization, how to select plans to participate, and whether to partner with the Department of Health and Human Services (HHS) to split up the work.

To reduce duplication of effort and the administrative burden on the states, HHS also announced that the federal government will partner with States to make Exchange development and operations more efficient. States can choose to develop an Exchange in partnership with the federal government or develop these systems themselves. This provides States more flexibility to focus their resources on designing the right Exchanges for their local insurance markets.

To review the proposed rule visit: http://www.ofr.gov/OFRUpload/OFRData/2011-17610_PI.pdf. The comment period closes on September 28, 2011. HHS will also convene a series of regional listening sessions and meetings to facilitate pubic comments. Additional guidance—including proposed rules related to eligibility and enrollment procedures for Exchanges and Medicaid—will be issued in the future.

For more information on Exchanges, including fact sheets, visit http://www.healthcare.gov/exchanges.

**Home Health Services; Policy Changes and Clarifications Related to Home Health**

On Tuesday, July 5, 2011, CMS released a Notice of Proposed Rule Making (NPRM) providing additional guidance to States on the implementation of section 6407 of the Affordable Care Act which adds a requirement that in the course of authorizing home health services, physicians must document the existence of a face-to-face encounter (including through the use of telehealth) with the Medicaid eligible individual within specified timeframes. This proposed rule aligns Medicaid implementation of face-to-face encounters with Medicare's regulatory guidance. This will improve facilitation of services for individuals dually eligible for both programs, and make it easier for providers participating in both programs to understand the rules. This provision was effective on January 1, 2010, but this is a proposed rule and comments are welcome.

In addition, this proposed rule clarifies that home health services, including medical supplies, equipment and appliances may not be restricted to the home, and if medically necessary, should be provided in any non-institutional setting in which normal life activities take place. It includes in regulation the definition of medical supplies, equipment and appliances.

For more information and instructions on how to submit comments on this rule, please visit: http://www.gpo.gov/fdsys/pkg/FR-2011-07-12/pdf/2011-16937.pdf. All comments are due by September 12, 2011.

**PRA Package for Medicaid and CHIP State Plan, Waiver, and Program Submissions**

On Friday, July 1, 2011, CMS published a generic Paperwork Reduction Act (PRA) package in the Federal Register that includes forms necessary for CMCS to conduct ongoing business with our State partners to continue the implementation of the Affordable Care Act provisions related to Medicaid and the CHIP. These forms include State plan amendments, waiver, demonstration and reporting templates that will be developed over the 3-year approval period.

This PRA package provides support to both States and CMS by:

- Developing streamlined submissions for States to implement health reform initiatives in Medicaid and CHIP;
- Enhancing collaboration and partnerships by documenting CMS policy for States to use as they are developing program changes; and
- Improving the efficiency of administration by creating a common and user friendly understanding of the information needed by CMS to process requests for State plan amendments, waiver, demonstrations and reporting.

For more information and instructions on how to submit comments on this rule, please visit: http://www.gpo.gov/fdsys/pkg/FR-2011-07-01/pdf/2011-16600.pdf. Comments and recommendations must be submitted by August 30, 2011.

**Encouraging States to Attend the CMS Second National Background Check Program Conference**

We are pleased to announce that the second CMS National Background Check Program (NBCP) Conference is scheduled for 2.5 days, September 13-15, 2011 at the Crowne Plaza Hotel, St. Louis-Downtown located at 200 N. Fourth Street, St. Louis, Missouri. This conference will provide education to NBCP grantee States as well as non-grantee States interested in establishing or improving their background check programs for long term care providers and facilities. Although grantee States are required to use grant funds to send at least three attendees to each of the NBCP conferences, we also hope States who have not yet received a grant will attend.

The NBCP conference is part of the technical assistance efforts CMS is providing to States in support of section 6201 of the Affordable Care Act of 2010, which directs the Secretary of the Department of Health and Human Services to establish a nationwide program to identify efficient,

**Appendix - 13**

effective, and economical procedures for long term care facilities and providers to conduct background checks on a statewide basis on all prospective direct patient access employees. The NBCP will enhance the safety of residents and clients of long term care providers by disqualifying certain offenders from positions that would bring them into contact with vulnerable populations served in long term care settings.

Non-grantee States interested in attending the second CMS NBCP Conference at their own expense, should contact Lisa Byrd, CMS Training Coordinator, via email at lisa.byrd@cms.hhs.gov by **Monday, August 1, 2011** for registration assistance. If you are a non-grantee State with travel funding issues that may prohibit attendance at this conference, please contact the Background Check Team at Background_Checks@cms.hhs.gov to discuss the potential for CMS assistance. For all other questions related to conference registration, please contact lisa.byrd@cms.hhs.gov.

**Inclusion of Training Costs in Rate Development**

In light of questions we have received, CMCS is providing this information regarding the mechanism by which provider-related training costs may be considered in the development of the rate of payment for medical services. Questions have come up particularly in the area of home health services.

Medicaid statute and regulations (section 1902 of the Social Security Act and 42 Code of Federal Regulations 430 and 447) allow reimbursement for covered services delivered by a qualified provider to an eligible beneficiary. Costs associated with requirements that are prerequisite to being a qualified Medicaid provider are not reimbursable by Medicaid. However, costs associated with maintaining status as a qualified provider may be included in determining the rate for services. Specifically, if as part of its provider qualification requirements, a State requires a provider to acquire a certain minimum number of hours of specified types of continuing education (CE) each period (annually or quarterly, for example), the State may recognize such CE expenses as a cost to the provider of doing business and may consider such costs in developing the rate paid for the service. The cost of CE may only be included as part of the rate paid for the service and may not be claimed separately by the Medicaid agency as an administrative expense.

For example, a State's provider qualification standards could require the direct service provider to: 1) have a high school diploma (or its equivalent) and be at least 18 years of age, and 2) complete a certain number of specified CE hours or credits during the calendar or fiscal year (or quarter) in order to maintain eligible provider status. The State could not pay, or include in its rates, costs for individuals to obtain a high school diploma or its equivalent. However, the State may include the estimated costs of meeting ongoing CE requirements in determining the rate paid for the service. If the provider fails to acquire the minimum required number of CE hours or credits, the provider would no longer be qualified, and no Medicaid payment could be made either for services or for the CE that would be needed as a prerequisite to regaining status as a qualified provider.

**Appendix - 13**

Similarly, should a State wish to promote advanced provider skills training to increase the availability of providers qualified to serve beneficiaries with more complicated or difficult medical needs, costs associated with that advanced training could also be included in the development of rates paid for services requiring more complex levels of care. The State could set provider qualification requirements at a separate and distinct level for those advanced level providers, and pay rates commensurate with their higher skill levels. The qualifications and rates could be higher than those for services furnished by less skilled individuals such as family members.

If you have additional questions, please contact Dianne Heffron, Director, Financial Management Group, who may be reached at (410) 786-3247.

**Pharmacy Pricing Survey**

CMS is pleased to announce that Myers and Stauffer, LC has been awarded a contract to conduct a Survey of Pharmacy Retail Prices. The survey, which was initially requested by States and which Secretary Sebelius committed to in her February 3, 2011 letter to Governors, is part of CMS' commitment to working with States to ensure that they have accurate information about drug costs in order to make prudent purchasing decisions.

The contractor will develop a monthly survey of retail community pharmacy prescription drug prices and generate of publicly available pricing files to help States. We anticipate that these files will afford State Medicaid agencies with a valid array of covered outpatient drug information, regarding retail prices for the ingredient costs of prescription drugs and consumer purchase prices for such drugs. We expect that State Medicaid agencies will be able to use this information to compare their own pricing methodologies and payments to those derived from this survey.

Additionally, on an annual basis, CMS will obtain from State Medicaid agencies information on their prescription drug payment and utilization rates and prepare a comparative report regarding the performance of the States' reimbursement prices and the national retail price data collected in the survey.

I hope that this information will be helpful to you.

**Appendix - 13**



## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Centers for Medicare & Medicaid Services

### 42 CFR Part 440

[CMS 2348–P]

RIN 0938–AQ36

### Medicaid Program; Face-to-Face Requirements for Home Health Services; Policy Changes and Clarifications Related to Home Health

**AGENCY:** Centers for Medicare & Medicaid Services (CMS), HHS.

**ACTION:** Proposed rule.

**SUMMARY:** This proposed rule would revise the Medicaid home health service definition as required by section 6407 of the Affordable Care Act to add a requirement that physicians document the existence of a face-to-face encounter (including through the use of telehealth) with the Medicaid eligible individual within reasonable timeframes. This proposal would align the timeframes with similar regulatory requirements for Medicare home health services in accordance with section 6407 of the Affordable Care Act and reflects CMS' commitment to the general principles of the President's Executive Order 13563 released January 18, 2011, entitled "Improving Regulation and Regulatory Review." In addition, this rule proposes to amend home health services regulations to clarify the definitions of included medical supplies, equipment and appliances, and clarify that States may not limit home health services to services delivered in the home, or to services furnished to individuals who are homebound.

**DATES:** To be assured consideration, comments must be received at one of the addresses provided below, no later than 5 p.m. September 12, 2011.

**ADDRESSES:** In commenting, please refer to file code CMS–2348–P. Because of staff and resource limitations, we cannot accept comments by facsimile (FAX) transmission.

You may submit comments in one of four ways (please choose only one of the ways listed):

1. *Electronically.* You may submit electronic comments on this regulation to *http://www.regulations.gov.* Follow the "Submit a comment" instructions.

2. *By regular mail.* You may mail written comments to the following address ONLY:
Centers for Medicare & Medicaid Services, Department of Health and Human Services, *Attention:* CMS–

2348–P, P.O. Box 8016, Baltimore, MD 21244–8016.

Please allow sufficient time for mailed comments to be received before the close of the comment period.

3. *By express or overnight mail.* You may send written comments to the following address ONLY: Centers for Medicare & Medicaid Services, Department of Health and Human Services, Attention: CMS–2348–P, Mail Stop C4–26–05, 7500 Security Boulevard, Baltimore, MD 21244–1850.

4. *By hand or courier.* If you prefer, you may deliver (by hand or courier) your written comments before the close of the comment period to either of the following addresses:

a. For delivery in Washington, DC— Centers for Medicare & Medicaid Services, Department of Health and Human Services, Room 445–G, Hubert H. Humphrey Building, 200 Independence Avenue, SW., Washington, DC 20201.

(Because access to the interior of the Hubert H. Humphrey Building is not readily available to persons without Federal Government identification, commenters are encouraged to leave their comments in the CMS drop slots located in the main lobby of the building. A stamp-in clock is available for persons wishing to retain a proof of filing by stamping in and retaining an extra copy of the comments being filed.)

b. For delivery in Baltimore, MD— Centers for Medicare & Medicaid Services, Department of Health and Human Services, 7500 Security Boulevard, Baltimore, MD 21244–1850.

If you intend to deliver your comments to the Baltimore address, please call telephone number (410) 786–7195 in advance to schedule your arrival with one of our staff members.

Comments mailed to the addresses indicated as appropriate for hand or courier delivery may be delayed and received after the comment period.

*Submission of comments on paperwork requirements.* You may submit comments on this document's paperwork requirements by following the instructions at the end of the "Collection of Information Requirements" section in this document.

For information on viewing public comments, see the beginning of the **SUPPLEMENTARY INFORMATION** section.

**FOR FURTHER INFORMATION CONTACT:** Melissa Harris, (410) 786–3397.

**SUPPLEMENTARY INFORMATION:**

*Inspection of Public Comments:* All comments received before the close of the comment period are available for

viewing by the public, including any personally identifiable or confidential business information that is included in a comment. We post all comments received before the close of the comment period on the following Web site as soon as possible after they have been received: *http:// www.regulations.gov.* Follow the search instructions on that Web site to view public comments.

Comments received timely will also be available for public inspection as they are received, generally beginning approximately 3 weeks after publication of a document, at the headquarters of the Centers for Medicare & Medicaid Services, 7500 Security Boulevard, Baltimore, Maryland 21244, Monday through Friday of each week from 8:30 a.m. to 4 p.m. To schedule an appointment to view public comments, phone 1–800–743–3951.

## I. Background

### A. General Information

Title XIX of the Social Security Act (the Act) requires that, in order to receive Federal Medicaid matching funds, a State must offer certain basic services to the categorically needy populations specified in the Act. Home health care for Medicaid-eligible individuals who are entitled to nursing facility services is one of these mandatory services. Individuals "entitled to" nursing facility services include the basic categorically needy populations that receive the standard Medicaid benefit package, and can include medically needy populations if nursing facility services are offered to the medically needy within a State. Home health services include skilled nursing, home health aide services, medical supplies, equipment, and appliances, and may include therapeutic services. Current Medicaid regulations require an individual's physician to order home health services as part of a written plan of care reviewed every 60 days.

### B. Summary of New Medicare Home Health Face-to-Face Statutory Requirements

Section 6407 of the Patient Protection and Affordable Care Act of 2010 (the Affordable Care Act), (Pub. L. 111–148, enacted on March 23, 2010), as amended by section 10605 of the Affordable Care Act, affects the home health benefit under both the Medicare and Medicaid programs.

Section 6407(a) of the Affordable Care Act (as amended by section 10605 of the Affordable Care Act) added new requirements to section 1814(a)(2)(C) of

**Appendix - 13**

the Act under Part A of the Medicare program, and section 1835(a)(2)(A) of the Act, under Part B of the Medicare program, that the physician, or certain allowed nonphysician practitioners (NPPs), document a face-to-face encounter with the individual (including through the use of telehealth, subject to the requirements in section 1834(m) of the Act), prior to making a certification that home health services are required under the Medicare home health benefit. Section 1814(a)(2)(C) of the Act indicates that in addition to a physician, a nurse practitioner or clinical nurse specialist (as those terms are defined in section 1861(aa)(5) of the Act) who is working in collaboration with the physician in accordance with State law, or a certified nurse-midwife (as defined in section 1861(gg) of the Act, as authorized by State law), or a physician assistant (as defined in section 1861(aa)(5) of the Act), under the supervision of the physician, may conduct the face-to-face encounters prior to the start of home health services.

Section 6407(b) of the Affordable Care Act amended section 1834(a)(11)(B) of the Act to require documentation of a similar face-to-face encounter with a physician or specific NPPs by a physician ordering durable medical equipment (DME). The NPPs authorized to conduct a face-to-face encounter on behalf of a physician are the same for this provision as for the provision described above, with one exception. We interpret sections 6407(b) and 6407(d) of the Affordable Care Act to prohibit certified nurse-midwives from conducting the face-to-face encounter prior to the physician ordering DME. The timing of this face-to-face encounter is specified as being within the 6-month period preceding the written order for DME, or other reasonable timeframe specified by the Secretary. This provision also maintains the role of the physician in the actual ordering of DME.

### C. Application of Home Health Face-to-Face Requirements to Medicaid

Section 6407(d) of the Affordable Care Act provides that the requirements for face-to-face encounters in the provisions described above "shall apply in the case of physicians making certifications for home health services under title XIX of the Social Security Act in the same manner and to the same extent as such requirements apply in the case of physicians making such certifications under title XVIII of such Act." The purpose of this regulation is to implement that statutory directive.

In implementing the face-to-face encounter requirements of section 6407 of the Affordable Care Act, we take into consideration the existing regulatory requirements under § 440.70 that provide that a physician must order an individual's services under the Medicaid home health benefit. We read the term "order" to be synonymous with the Medicare term "certify." For purposes of this rule, we use the term "order" in place of the Affordable Care Act's use of "certify."

We do not view implementation of section 6407 of the Affordable Care Act as supplanting the existing Medicaid regulatory requirements related to physician orders but as consistent with those requirements. The provisions of section 6407 of the Affordable Care Act make clear that the physician's order must be based on a face-to-face encounter. In addition, section 6407 of the Affordable Care Act provides that specific NPP may perform the face-to-face encounter with the individual in lieu of the physician, and inform the physician making the initial order for service under the Medicaid home health benefit.

Consistent with that view, in the proposed regulation, we would provide that the physician must document the face-to-face encounter regardless of whether the physician himself or herself or one of the permitted NPPs performed the face-to-face encounter. The timing of this face-to-face encounter is specified as being within the 6-month period preceding the written order for home health services, or other reasonable timeframe specified by the Secretary.

Similarly, in implementing the requirements under section 6407(b) of the Affordable Care Act, relating to DME, we take into account existing Medicaid regulatory requirements under § 440.70 requiring physician orders. Because DME is not a term used in Medicaid in the same manner as in Medicare, we use the Medicaid term "medical supplies, equipment and appliances" or the shortened version "medical equipment." The NPPs authorized to conduct a face-to-face encounter on behalf of a physician are the same for this provision as for the provision described above, with one exception. Certified nurse-midwives are not permitted to conduct the face-to-face encounter prior to the physician ordering medical equipment. Therefore, we are proposing to amend the Medicaid regulations at § 440.70 to incorporate both the general home health and the medical equipment face-to-face requirements.

### D. Other Medicaid Home Health Policy Changes

1. Clarification That Home Health Services Cannot Be Restricted to Individuals Who Are Homebound or to Services Furnished in the Home

We are proposing to incorporate in regulation that home health services may not be subject to a requirement that the individual be "homebound." In addition, we are proposing to clarify that home health services cannot otherwise be restricted to services furnished in the home itself.

On July 25, 2000, we issued a letter to State Medicaid Directors, Olmstead Update No: 3, in which we discussed Federal policies relevant to State efforts to comply with the requirements of the Americans with Disabilities Act (ADA) in light of the Supreme Court decision in *Olmstead* v. *L.C.*, 527 U.S. 581 (1999). In attachments to that letter, we set forth specific policy clarifications to allow States more flexibility to serve individuals with disabilities in various ways and in different settings.

Attachment 3-g of the letter: "Prohibition of Homebound Requirements in Home Health" clarified that the use of a "homebound" requirement under the Medicaid home health benefit violates Federal regulatory requirements at § 440.230(c) and § 440.240(b). These requirements provide that mandatory benefits must be sufficient in amount, duration and scope to reasonably achieve their purpose, may not be arbitrarily denied or reduced in scope based on diagnosis, type of illness, or condition, and that the same amount, duration and scope must be available to any individual within the group of categorically needy individuals and within any group of medically needy individuals. In the attachment, we stated that the restriction of home health services to individuals who are homebound to the exclusion of other individuals in need of these services ignores the reality that individuals with disabilities can and do live and function in the community. We further noted that developments in technology and service delivery made it possible for individuals with even the most severe disabilities to participate in a wide variety of activities in the community with appropriate supports. We also expressed the importance of ensuring that Medicaid is available to provide medically necessary home health services to individuals in need of those services who are not homebound and continue to be an important part of efforts to offer individuals with disabilities services in the most

**Appendix - 13**

integrated setting appropriate to their needs, in accordance with the ADA.

We are clarifying in this rule that Medicaid home health services may not be limited to services furnished in the home. This policy reflects prior court cases on the subject. In *Skubel* v. *Fuoroli, 113 F.3d 330 (2d. Cir. 1997)* the court found that the Medicaid statute did not address the site of care for the mandatory home health benefit. The court found that the State could not limit coverage of home health services to those provided at the individual's residence. In 1990, the same court ruled invalid an interpretation that limited the provision of private duty nursing services to an individual's residence. The case, *Detsel* v. *Sullivan*, 895 F.2d 58 (2d Cir.1990), involved children suffering from severe medical conditions. Following the *Detsel* case, CMS, then the Health Care Financing Administration, ultimately adopted the court's standard and issued nationwide guidance eliminating the at-home restriction on private duty nursing. To date, we have not issued similar guidance requiring nationwide adoption of the *Skubel* ruling. We are using our authority through this rulemaking opportunity to do so.

### 2. Clarification of the Definition of Medical Supplies, Equipment and Appliances

An important component of the Medicaid home health benefit is medical supplies, equipment and appliances, under § 447.70(b)(3). The current wording of the regulation does not further define these terms, except to indicate that these items should be "suitable for use in the home." Although this phrase could be read to refer only to the type of items included in the benefit, it has been susceptible to reading as a prohibition on use of covered items outside the home. We are using this opportunity to revise that phrase to make clear that it is not a limitation on the location in which items are used, but rather refers to items that are necessary for everyday activities and not specialized for an institutional setting. Thus we would indicate that these items must be "suitable for use in any non-institutional setting in which normal life activities take place." This would clarify that although States may continue to establish medical necessity criteria to determine the authorization of these items, States may not deny requests for these items based on the grounds that they are for use outside of the home.

Current Medicaid regulations do not contain any specific definition of medical supplies, equipment, and

appliances under the home health benefit, other than the language discussed in the prior paragraph. States have adopted reasonable definitions of those terms, for example, based on the Medicare definition. But in the absence of a generally applicable definition of the term, there has been confusion as to the proper scope of the benefit.

We believe that a consistent approach to categorizing home health medical supplies, equipment, and appliances will ensure beneficiaries are receiving needed items and provide clear and consistent guidance to States to ensure the use of the appropriate benefit category. We are now taking this opportunity to propose criteria defining home health supplies, equipment, and appliances, to better align with the Medicare program's definition of durable medical equipment found at § 414.202. We propose that supplies are defined as "health care related items that are consumable or disposable, or cannot withstand repeated use by more than one individual." We propose that medical equipment and appliances are "items that are primarily and customarily used to serve a medical purpose, generally not useful to an individual in the absence of an illness or injury, can withstand repeated use, and can be reusable or removable."

We believe these standard definitions will ensure that such items will be available to all who are entitled to the home health benefit, and not restricted to individuals eligible for targeted benefits through home and community-based services (HCBS) waivers or the section 1915(i) HCBS State Plan option. Items that meet the criteria for coverage under the home health benefit must be covered as such. States will not be precluded from covering items meeting this definition through a section 1915(c) HCBS waiver service, such as a home modification, or through a section 1915(i) State Plan option. However, the State must also offer those items as home health supplies, equipment, and appliances.

### 3. Other Issues

We note that we are considering whether other clarifications to the home health regulations are warranted. In particular, we are considering whether it would be useful to include language to reflect the policies set forth in a September 4, 1998 letter to State Medicaid Directors, responding in part to a Second Circuit decision in *Desario* v. *Thomas*, 139 F. 3d 80 (1998), about the use of lists or other presumptions in determining coverage of items under the home health benefit for medical equipment. In that letter, we indicated

that a State could use such lists or presumptions, but must provide individuals the opportunity to rebut the list or presumption with a process that employs reasonable and specific criteria to assess coverage for an item based on individual medical needs, and determine whether the list or presumption is based on an arbitrary exclusion based on diagnosis, type of illness, or condition. We have not proposed any language to reflect this policy in part because the principles at issue are not specific to home health medical equipment. We invite comment on this issue.

In addition, in the May 5, 2010 **Federal Register** (75 FR 24437), we issued the "Medicare and Medicaid Programs: Changes in Provider and Supplier Enrollment, Ordering and Referring, and Documentation Requirements; and Changes in Provider Agreements", interim final rule which was effective on July 6, 2010. Although we have not incorporated changes to the scope of providers that may order medical supplies, equipment and appliances in the Medicaid program, as section 6405(a) of the Affordable Care Act was not applicable to Title XIX, we are specifically soliciting comments through this rule on the merits of doing so.

### II. Provisions of the Proposed Regulations

Please note that although the Affordable Care Act uses the term "individual" to refer to the Medicaid beneficiary, throughout this proposed rule we have used "recipient" to mirror the regulation text in the current Medicaid home health regulations. At this time, we do not intend to modify this term.

For the reasons discussed above, we propose to modify § 440.70(b)(3) to say the following: "Medical supplies, equipment and appliances suitable for use in any non-institutional setting in which normal life activities take place."

In § 440.70(b)(3)(i) and (ii), we propose revising the current text to define what constitutes medical supplies, equipment, and appliances. We propose to indicate that supplies are defined as "health care related items that are consumable or disposable, or cannot withstand repeated use by more than one individual." We propose to indicate that medical equipment and appliances are "items that are primarily and customarily used to serve a medical purpose, generally not useful to an individual in the absence of an illness or injury, can withstand repeated use, and can be reusable or removable." We

**Appendix - 13**

are specifically soliciting comment on these proposed provisions.

For the reasons discussed above, we propose to modify § 440.70(c), to add the following text to the end of the current provision: "Nothing in this section should be read to prohibit a recipient from receiving home health services in any non-institutional setting in which normal life activities take place." Although the Court indicated that individuals would be limited to the same number of service hours they would have received if the home health services were provided only in their place of residence, in an effort to not limit the ability of States to offer a more robust home health benefit, we propose to allow States the option to authorize additional services or hours of services to account for this new flexibility. We also propose to add more text at the end of this provision as follows: "Additional services or service hours may, at the State's option, be authorized to account for medical needs that arise in these settings". This will incorporate both the *Skubel* and *Olmstead* decisions into the provision of home health services. This State flexibility would be applied to the State's Medicaid program as a whole, and would not be a person-specific flexibility. State medical necessity criteria would continue to be applied uniformly to all Medicaid individuals. We note that any such additional hours of service that are authorized by the State would be matched at the State's current Federal Medical Assistance Percentage (FMAP).

The remainder of this section pertains to proposed changes to § 440.70 to incorporate provisions of the Affordable Care Act.

Section 6407 of the Affordable Care Act requires, as a condition for payment for home health services, documentation of a face-to-face encounter prior to an order for such services. Section 6407 of the Affordable Care Act requires that the timing of the face-to-face encounter for home health services must occur within the 6-month period preceding certification, or other reasonable timeframe determined by the Secretary. Based on the same reasoning set out in the Medicare final rule, Medicare Program; Home Health Prospective Payment System Rate Update for Calendar Year 2011; Changes in Certification Requirements for Home Health Agencies and Hospices as published in the November 17, 2010, **Federal Register**, we propose to determine a reasonable timeframe for the face-to-face encounter that is shorter than 6 months. The statutory goal is to achieve greater physician accountability in ordering home health services. To

achieve this goal, the encounter must occur close enough to the start of home health services to ensure that the clinical conditions exhibited by the recipient during the encounter are related to the primary reason for the recipient's need for home health services. As such, we believe that encounters would need to occur closer to the start of home health services rather than the 6-month period initially indicated, but not required by the Affordable Care Act.

Consistent with the Medicare program's implementation of this provision, we propose to indicate in a new § 440.70(f)(1) that for the initial ordering of home health services, the physician must document that a face-to-face encounter that is related to the primary reason the individual requires home health services has occurred no more than 90 days prior to the start of services under the Medicaid home health benefit. We believe that in most cases, a face-to-face encounter with a recipient within the 90 days prior to the start of home health services will provide the physician and/or specified NPPs with a current clinical presentation of the recipient's condition such that the physician can accurately order home health services and establish an effective care plan, based on the encounter conducted by either the physician or allowed NPP. We also believe that a face-to-face encounter which occurs within 90 days prior to the start of services would be generally relevant to the reason for the recipient's need for home health services, and therefore such a face-to-face encounter would be sufficient to meet the goals of this statutory requirement. We recognize, however, that there may be circumstances when it may not be possible to meet this general requirement, and the individual's access to needed services must be protected. To account for these circumstances, we also propose in § 440.70(f)(1) to allow an opportunity to meet the face-to-face encounter requirement through an encounter with the recipient within 30 days after the start of home health services.

While we recognize the necessity of permitting face-to-face encounters to occur after the start of services in the instances described above, we emphasize that the timing of the face-to-face encounter in normal circumstances should occur within the 90 days prior to the start of home health services.

The statute describes NPPs who may perform this face-to-face encounter as a nurse practitioner or clinical nurse specialist, as those terms are defined in section 1861(aa)(5) of the Act, who is

working in collaboration with the physician in accordance with State law, or a certified nurse-midwife (as defined in section 1861(gg) of the Act, as authorized by State law), or a physician assistant (as defined in section 1861(aa)(5) of the Act), under the supervision of the physician.

The statutory provision allows the permitted NPPs to perform the face-to-face encounter and inform the physician, who documents the encounter.

Based on the same reasoning set out in the Medicare proposed rule, Medicare Program; Home Health Prospective Payment System Rate Update for Calendar Year 2012; published elsewhere in this **Federal Register**, for individuals admitted to home health upon discharge from a hospital or post-acute setting, we propose to also allow the physician who attended to the individual in the hospital or post-acute setting to inform the ordering physician regarding their encounters with the individual to satisfy the face-to-face encounter requirement, much like an NPP currently can.

We propose to add a new § 440.70(f)(2) to list the practitioners that may perform the face-to-face encounters. These practitioners include the physician already referenced in § 440.70(a)(2), and the following NPPs: A nurse practitioner or clinical nurse specialist (as those terms are defined in section 1861(aa)(5) of the Act) who is working in collaboration with the physician in accordance with State law, or a certified nurse-midwife (as defined in section 1861(gg) of the Act, as authorized by State law), or a physician assistant (as defined in section 1861(aa)(5) of the Act), under the supervision of the physician, and for recipients admitted to home health immediately after an acute or post-acute stay, the attending acute or post-acute physician.

We also propose to add a new § 440.70(f)(3) to indicate that if an attending acute or post-acute physician or allowed NPP conducts the face-to-face visit, the attending acute or post-acute physician or practitioner is required to communicate the clinical findings of the face-to-face encounter to the physician, in order for the physician to document the face-to-face encounter accordingly. This requirement is necessary to ensure that the physician has sufficient information to determine the need for home health services, in the absence of conducting the face-to-face encounter himself or herself. We are also proposing to specify that these clinical findings must be reflected in a written or electronic document included

**Appendix - 13**

in the recipient's medical record (whether by the physician or by the NPP). We are not prescribing at the Federal level the specific elements necessary to document the face-to-face encounter, as that is a matter of clinical judgment that could vary according to the individual circumstance. However, States may choose to implement a minimum list of required information to adequately document the encounter.

In a new § 440.70(f)(4)(i), we propose to require that the physician's documentation of the face-to-face encounter must be either a separate and distinct area on the written order, an addendum to the order that is easily identifiable and clearly titled, or a separate document easily identifiable and clearly titled in the recipient's medical record. The documentation must also describe how the health status of the recipient at the time of the face-to-face encounter is related to the primary reason the recipient requires home health services. In a new § 440.70(f)(4)(ii), we propose to require that the physician's documentation of the face-to-face encounter be clearly titled, and state that either the physician himself or herself, or the applicable NPP, has conducted a face-to-face encounter with the recipient and include the date of that encounter.

Finally, we propose to add a new § 440.70(f)(5) to indicate that the face-to-face encounters may be performed through the use of telehealth. We are aware that many States currently make use of telehealth or telemedicine in the delivery of Medicaid services. Medicaid has issued informal guidance on the parameters of telehealth and telemedicine that is modeled after Medicare requirements. We are proposing to allow States to continue utilizing their current telehealth technologies as they apply to the implementation of this provision, however we are cognizant that State Medicaid telehealth policies may not align with Medicare's. We wish to minimize duplication and fragmentation of services for beneficiaries who are dually-eligible for Medicare and Medicaid, and therefore we are specifically soliciting comment on approaches to telehealth policy that would further this goal.

In a new § 440.70(g), we propose to apply all of the requirements of § 440.70(f) to the provision of supplies, equipment and appliances as described in § 440.70(b)(3) to the extent that a face-to-face encounter would be required under the Medicare program for durable medical equipment, with one exception from the requirements at § 440.70(f). The Affordable Care Act does not permit certified nurse midwives to conduct face-to-face encounters required for these items. This is reflected in our proposed § 440.70(g)(2).

The proposal to limit the face-to-face requirements to items that would be subject to such requirements as durable medical equipment under the Medicare program is based on the aim of maximizing consistency with the Medicare program's implementation of section 6407 of the Affordable Care Act and reducing administrative burden on the provider community. Thus we would only require that, for items of durable medical equipment specified by CMS under the Medicare program as subject to a face-to-face encounter requirement, the physician must document that a face-to-face encounter that is related to the primary reason the individual requires the item has occurred no more than 90 days before the order is written or within 30 days after the order is written. We intend to issue guidance to States indicating how they, and providers, can access the current Medicare list of specific durable medical equipment items subject to the face-to-face requirement.

Medical supplies, equipment and appliances for which a face-to-face encounter would not be required under the Medicare program as durable medical equipment, would not require a face-to-face encounter prior to the ordering of items under the Medicaid program. These items will be of a smaller dollar value, and at a decreased risk for fraud, waste and abuse. We welcome public comment on this approach.

We recognize the difficulty that some recipients with complex medical needs may face in participating in a face-to-face encounter (such as issues with accessing transportation, obtaining caregiver support, etc.,) particularly in rural areas. Once this rule is finalized, we expect States to implement this provision in a way that does not result in barriers to service delivery, as this is not the intent of the legislation. The statute specifically references telehealth as an alternative for ensuring that this new requirement is implemented in a way that protects continuity of services. We encourage States to work with the home health provider community to incorporate these face-to-face visits in creative and flexible ways to account for individual circumstances. We are available to provide technical assistance to States in achieving this goal.

In keeping with a movement across all Medicaid services, we expect the plans of care developed to address a recipient's home health needs be done in a way that embraces a person-centered philosophy. For clarification and consistency among programs, our expectation regarding the person-centered philosophy is that the plan of care reflects what is important to the recipient and for the recipient. The person-centered approach is a process, directed by the recipient with long-term support needs, or by another person important in the life of the recipient who the recipient has freely chosen to direct this process, intended to identify the strengths, capacities, preferences, needs, and desired outcomes of the recipient. The person-centered process includes the opportunity for the recipient to choose others to serve as important contributors to the planning process.

This process and the resulting service plan will assist the recipient in achieving personally defined outcomes in the most integrated community setting in a manner that reflects what is important to the recipient to ensure delivery of services in a manner that reflects personal preferences and choices, and what is important for the recipient to meet identified support needs.

## III. Collection of Information Requirements

Under the Paperwork Reduction Act of 1995, we are required to provide 60-day notice in the **Federal Register** and solicit public comment before a collection of information requirement is submitted to the Office of Management and Budget (OMB) for review and approval. In order to fairly evaluate whether an information collection should be approved by OMB, section 3506(c)(2)(A) of the Paperwork Reduction Act of 1995 requires that we solicit comment on the following issues:

• The need for the information collection and its usefulness in carrying out the proper functions of our agency.

• The accuracy of our estimate of the information collection burden.

• The quality, utility, and clarity of the information to be collected.

• Recommendations to minimize the information collection burden on the affected public, including automated collection techniques.

We are soliciting public comment on each of these issues for the following sections of this document that contain information collection requirements (ICRs):

Proposed § 440.70(f)(3) and (g)(1) require NPPs and attending acute or post-acute physicians to communicate the clinical findings of the face-to-face encounter to the ordering physician. The burden associated with these

**Appendix - 13**

requirements would be the time and effort required for the NPP and attending acute or post-acute physicians to complete this communication. This is estimated at 10 minutes for each encounter. We estimate that there would be 1,143,443 initial home health episodes in a year based on our 2008 claims data. As such, the estimated burden for the NPP and attending acute or post-acute physicians documenting, signing, and dating the recipient's face-to-face encounter would be 190,574 hours for CY 2011.

Proposed § 440.70(f)(4) and (g)(1) would require that physicians document the existence of a face-to-face encounter with the Medicaid eligible recipient. The burden associated with these requirements would be the time and effort required for the physician to complete and maintain this documentation. The ordering physician's burden for composing the face-to-face documentation, which would include determining how the clinical findings of the encounter support eligibility; writing, typing, or dictating the face-to-face documentation; signing, and dating the recipient's face-to-face encounter is estimated at 10 minutes for each encounter. We estimate that there would be 1,143,443 initial home health episodes in a year based on our 2008 claims data. As such, the estimated burden for the physician documenting, signing, and dating the recipient's face-to-face encounter would be 190,574 hours for CY 2011. We acknowledge that this figure is inflated by the instances in which the physician himself or herself conducted the face-to-face encounter with the individual, making this second 10-minute documentation burden unnecessary.

This notice of proposed rulemaking also serves as the required 60-day **Federal Register** notification for aforementioned information collection requirements. To obtain copies of the supporting statement and any related forms for the proposed paperwork collections referenced above, access CMS' Web site at *http://www.cms.gov/ PaperworkReductionActof1995/PRAL/ list.asp#TopOfPage* or e-mail your request, including your address, phone number, OMB number, and CMS document identifier, to *Paperwork@cms.hhs.gov*, or call the Reports Clearance Office at 410–786–1326.

If you comment on these information collection and recordkeeping requirements, please do either of the following:

1. Submit your comments electronically as specified in the **ADDRESSES** section of this proposed rule; or

2. Submit your comments to the Office of Information and Regulatory Affairs, Office of Management and Budget, *Attention:* CMS Desk Officer, [CMS–2348–P] *Fax:* (202) 395–6974; or *E-mail: OIRA_submission@omb.eop.gov.*

## IV. Response to Comments

Because of the large number of public comments we normally receive on **Federal Register** documents, we are not able to acknowledge or respond to them individually. We will consider all comments we receive by the date and time specified in the **DATES** section of this preamble, and, when we proceed with a subsequent document, we will respond to the comments in the preamble to that document.

## V. Regulatory Impact Statement

### A. Statement of Need

This regulation is necessary to implement Section 6407 of the Patient Protection and Affordable Care Act of 2009 (the Affordable Care Act), (Pub. L. 111–148, enacted on March 23, 2010), as amended by section 10605 of the Affordable Care Act which affects the home health benefit under both the Medicare and Medicaid programs.

Section 6407(a) of the Affordable Care Act (as amended by section 10605) added new requirements to section 1814(a)(2)(C) of the Act under Part A of the Medicare program, and section 1835(a)(2)(A) of the Act, under Part B of the Medicare program, that the physician, or certain allowed nonphysician practitioners (NPPs), document a face-to-face encounter with the individual (including through the use of telehealth, subject to the requirements in section 1834(m) of the Act), prior to making a certification that home health services are required under the Medicare home health benefit. Section 1814(a)(2)(C) of the Act indicates that in addition to a physician, a nurse practitioner or clinical nurse specialist (as those terms are defined in section 1861(aa)(5) of the Act) who is working in collaboration with the physician in accordance with State law, or a certified nurse-midwife (as defined in section 1861(gg) of the Act, as authorized by State law), or a physician assistant (as defined in section 1861(aa)(5) of the Act), under the supervision of the physician, may conduct the face-to-face encounters prior to the start of home health services.

Section 6407(b) of the Affordable Care Act amended section 1834(a)(11)(B) of the Act to require documentation of a similar face-to-face encounter with a physician or specific NPPs by a physician ordering durable medical equipment (DME). The NPPs authorized to conduct a face-to-face encounter on behalf of a physician are the same for this provision as for the provision described above, with one exception. Certified nurse-midwives are not permitted to conduct the face-to-face encounter prior to the physician ordering DME. The timing of this face-to-face encounter is specified as being within the 6-month period preceding the written order for DME, or other reasonable timeframe specified by the Secretary. This provision also maintains the role of the physician in the actual ordering of DME.

### B. Overall Impact

We have examined the impacts of this rule as required by Executive Order 12866 on Regulatory Planning and Review (September 30, 1993), Executive Order 13563 on Improving Regulation and Regulatory Review (January 18, 2011), the Regulatory Flexibility Act (RFA) (September 19, 1980, Pub. L. 96–354), section 1102(b) of the Social Security Act, section 202 of the Unfunded Mandates Reform Act of 1995 (March 22, 1995, Pub. L. 104–4), and Executive Order 13132 on Federalism (August 4, 1999), and the Congressional Review Act (5 U.S.C. 804(2)).

Executive Orders 12866 and 13563 direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. A regulatory impact analysis (RIA) must be prepared for major rules with economically significant effects ($100 million or more in any 1 year). We tentatively estimate that this rulemaking may be "economically significant" as measured by the $100 million threshold, and, therefore, may be a major rule under the Congressional Review Act. Accordingly, we have prepared a Regulatory Impact Analysis which to the best of our ability presents the costs and benefits of the rulemaking.

The CMS Office of the Actuary estimated Section 6407 as having no potential impact on Federal Medicaid costs and savings. According to the CMS Actuarial estimates, Section 6407 would bring an estimated $350 million in

**Appendix - 13**

savings to the Medicare program from 2010–2014 and $870 million in savings from 2010–2019. Although this provision applies to Medicaid in the same manner and to the same extent as the Medicare program, no estimates (costs or savings) were noted for the Medicaid program.

Although there is no quantitative data to arrive at a specific dollar figure to attribute to the additional medical supplies, equipment, and appliances that may now be authorized in accordance with § 440.70(b)(3), we acknowledge the potential for this provision to surpass the threshold for economic significance. We wish to note however, that this provision may result in offsetting benefits to both beneficiaries and State budgets, including the ability for individuals to return to or enter the workforce, thereby increasing the pool of taxpayers, and decreasing reliance on other Medicaid benefits, including institutional care. Although there is no specific estimate regarding these benefits, they nonetheless should be taken into account. We are specifically soliciting comment on the potential increased costs and benefits associated with this provision, as well as the various sections throughout the RIA.

The RFA requires agencies to analyze options for regulatory relief for small entities, if a rule has a significant impact on a substantial number of small entities. For purposes of the RFA, small entities include small businesses, nonprofit organizations, and small government jurisdictions. Most hospitals and most other providers and suppliers are small entities, either by nonprofit status or by having revenues of $7.0 million to $34.5 million in any 1 year. For details, see the Small Business Administration's final rule that set forth size standards for health care industries, (65 FR 69432, November 17, 2000). Individuals and States are not included in the definition of a small entity. We are not preparing an analysis for the RFA because the Secretary has determined that this proposed rule would not have a significant economic impact on a substantial number of small entities.

In addition, section 1102(b) of the Social Security Act requires us to prepare a regulatory impact analysis if a rule may have a significant impact on the operations of a substantial number of small rural hospitals. This analysis must conform to the provisions of section 603 of the RFA. For purposes of section 1102(b) of the Act, we define a small rural hospital as a hospital that is located outside of a Metropolitan Statistical Area and has fewer than 100 beds. We are not preparing an analysis for section 1102(b) of the Act because the Secretary has determined that this proposed rule would not have a significant impact on the operations of a substantial number of small rural hospitals.

Section 202 of the Unfunded Mandates Reform Act (UMRA) of 1995 also requires that agencies assess anticipated costs and benefits before issuing any rule that may result in expenditure in any one year of $100 million in 1995 dollars, updated annually for inflation. In 2011, that threshold level is approximately $136 million. This proposed rule will not result in an impact of $136 million or more on State, local or tribal governments, in the aggregate, or on the private sector.

Executive Order 13132 establishes certain requirements that an agency must meet when it promulgates a proposed rule (and subsequent final rule) that imposes substantial direct requirement costs on State and local governments, preempts State law, or otherwise has Federalism implications. Since this regulation does not impose any costs on State or local governments, the requirements of Executive Order 13132 are not applicable.

*C. Conclusion*

We tentatively estimate that this rule may be "economically significant" as measured by the $100 million threshold as set forth by Executive Order 12866, as well as the Congressional Review Act. The analysis above provides our initial Regulatory Impact Analysis. We have not prepared an analysis for the RFA, section 1102(b) of the Act, section 202 of the UMRA, and Executive Order 13132 because the provisions are not impacted by this rule.

In accordance with the provisions of Executive Order 12866, this regulation was reviewed by the Office of Management and Budget.

**List of Subjects in 42 CFR Part 440**

Grant programs—health, Medicaid.

For the reasons set forth in the preamble, the Centers for Medicare & Medicaid Services proposes to amend 42 CFR chapter IV as set forth below:

**PART 440—SERVICES: GENERAL PROVISIONS**

1. The authority citation for part 440 continues to read as follows:

**Authority:** Sec. 1102 of the Social Security Act (42 U.S.C. 1302).

**Subpart A—Definitions**

2. Section 440.70 is amended by—

A. Redesignating paragraphs (b)(3)(i) and (ii) as (b)(3)(iii) and (iv), respectively.

B. Revising the introductory text of paragraph (b)(3).

C. Adding new paragraphs (b)(3)(i) and (ii).

D. Adding paragraphs (c)(1) and (2).

E. Adding paragraphs (f) and (g).

The revisions and additions read as follows:

**§ 440.70  Home health services.**

\*    \*    \*    \*    \*

(b) \*  \*  \*

(3) Medical supplies, equipment, and appliances suitable for use in any non-institutional setting in which normal life activities take place.

(i) Supplies are defined as health care related items that are consumable or disposable, or cannot withstand repeated use by more than one individual.

(ii) Equipment and appliances are defined as items that are primarily and customarily used to serve a medical purpose, generally not useful to an individual in the absence of an illness or injury, can withstand repeated use, and can be reusable or removable.

\*    \*    \*    \*    \*

(c) \*  \*  \*

(1) Nothing in this section should be read to prohibit a recipient from receiving home health services in any non-institutional setting in which normal life activities take place.

(2) Additional services or service hours may, at the State's option, be authorized to account for medical needs that arise in these settings.

\*    \*    \*    \*    \*

(f) No payment may be made for services referenced in paragraphs (b)(1), (2), and (4) of this section, unless the physician referenced in paragraph (a)(2) of this section documents that there was a face-to-face encounter with the recipient that meets the following requirements:

(1) For the initiation of services, the face-to-face encounter must be related to the primary reason the recipient requires home health services and must occur within the 90 days prior to or within the 30 days after the start of the services.

(2) The face-to-face encounter may be conducted by one of the following practitioners:

(i) The physician referenced in paragraph (a)(2) of this section;

(ii) A nurse practitioner or clinical nurse specialist, as those terms are defined in section 1861(aa)(5) of the Act, working in collaboration with the physician described in paragraph (a) of

this section, in accordance with State law;

(iii) A certified nurse midwife, as defined in section 1861(gg) of the Act, as authorized by State law;

(iv) A physician assistant, as defined in section 1861(aa)(5) of the Act, under the supervision of the physician described in subparagraph (a) of this section; or

(v) For recipients admitted to home health immediately after an acute or post-acute stay, the attending acute or post-acute physician.

(3) The allowed nonphysician practitioner, as described in paragraph (f)(3)(ii) through (iv) of this section, or the attending acute or post-acute physician, as described in paragraph (f)(3)(v) of this section, performing the face-to-face encounter must communicate the clinical findings of that face-to-face encounter to the ordering physician. Those clinical findings must be incorporated into a written or electronic document included in the recipient's medical record.

(4) To assure clinical correlation between the face-to-face encounter and the associated home health services, the physician responsible for ordering the services must:

(i) Document the face-to-face encounter as a separate and distinct area on the order itself, as an easily identifiable and clearly titled addendum to the order, or a separate document easily identifiable and clearly titled in the recipient's medical record, to describe how the health status of the recipient at the time of the face-to-face encounter is related to the primary reason the recipient requires home health services.

(ii) Must indicate the practitioner who conducted the encounter, and be clearly titled and dated on the documentation of the face-to-face encounter.

(5) The face-to-face encounter may occur through telehealth, as implemented by the State.

(g)(1) No payment may be made for medical equipment, supplies, or appliances referenced in paragraph (b)(3) of this section to the extent that a face-to-face encounter requirement would apply as durable medical equipment under the Medicare program, unless the physician referenced in paragraph (a)(2) of this section documents a face-to-face encounter with the recipient consistent with the requirements of paragraph (f) of this section except as indicated below.

(2) The face-to-face encounter may be performed by any of the practitioners described in paragraph (f)(2) of this section, with the exception of certified nurse-midwives, as described in paragraph (f)(2)(iii) of this section.

(Catalog of Federal Domestic Assistance Program No. 93.778, Medical Assistance Program).

Dated: March 2, 2011.

**Donald M. Berwick,**

*Administrator, Centers for Medicare & Medicaid Services.*

Approved: June 3, 2011.

**Kathleen Sebelius,**

*Secretary, Department of Health and Human Services.*

[FR Doc. 2011–16937 Filed 7–5–11; 4:15 pm]

**BILLING CODE 4120–01–P**

# Appendix - 13

### 2.2.25 Procedure Codes That Do Not Require Prior Authorization

The procedure codes listed in the following table do not require prior authorization for clients who are receiving services under Home Health Services. Although prior authorization is not required, providers must retain a completed Home Health Services (Title XIX) Durable Medical Equipment (DME)/Medical Supplies Physician Order Form for these clients. For medical supplies not requiring prior authorization, a completed Home Health Services (Title XIX) Durable Medical Equipment (DME)/Medical Supplies Physician Order Form may be valid for a maximum of six months unless the physician indicates the duration of need is less. If the physician indicates the duration of need is less than six months, then a new Home Health Services (Title XIX) Durable Medical Equipment (DME)/Medical Supplies Physician Order Form is required at the end of the duration of need. It is expected that reasonable, medically necessary amounts will be provided.

The use of these services is subject to retrospective review. This is not an all inclusive list.

| Procedure Codes | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Nebulizer Supplies/Equipment*** | | | | | | | | | |
| E0570 | E0575 | E0580 | S8101 | | | | | | |
| **Incontinence Supplies**** | | | | | | | | | |
| A4310 | A4311 | A4312 | A4313 | A4314 | A4315 | A4316 | A4320 | A4321 | A4322 |
| A4326 | A4327 | A4328 | A4330 | A4335 | A4338 | A4340 | A4344 | A4346 | A4351 |
| A4352 | A4353 | A4354 | A4355 | A4356 | A4357 | A4358 | A4402 | A4554 | A5102 |
| A5105 | A5112 | A5113 | A5114 | A5120 | A5121 | A5122 | A5131 | | |
| **Inhaler Equipment** | | | | | | | | | |
| A4614 | A4627 | | | | | | | | |
| * Prior authorization is required for certain diagnoses and if limitations are exceeded. Refer to Subsection 2.2.19.2, "Nebulizers" in this handbook. <br> ** Prior authorization is required for some procedure codes if the maximum limitation is exceeded. Refer to Subsection 2.2.12.9, "Incontinence Procedure Codes with Limitations" in this handbook. | | | | | | | | | |

## 2.3 Other/Special Provisions

### 2.3.1 Medicaid Relationship to Medicare

#### 2.3.1.1 Possible Medicare Clients

It is the provider's responsibility to determine the type of coverage (Medicare, Medicaid, or private insurance) that the client is entitled to receive. Home health providers must follow these guidelines:

- Clients who are 64 years of age and younger without Medicare Part A or B:

  - If the agency erroneously submits an SOC notice to Medicare and does not contact TMHP for prior authorization, TMHP does not assume responsibility for any services provided before contacting TMHP. The SOC date is no more than three business days before the date the agency contacts TMHP. Visits made before this date are not considered a benefit of the Home Health Services Program.

- Clients who are 65 years of age and older without Medicare Part A or Part B and clients with Medicare Part A or B regardless of age:

  - In filing home health claims, home health providers may be required to obtain Medicare denials before TMHP can approve coverage. When TMHP receives a Medicare denial, the SOC is determined by the date the agency requested coverage from Medicare. If necessary, the 95-day claims filing deadline is waived for these claims, provided TMHP receives notice of the Medicare denial within 30 days of the date on the MRAN containing Medicare's final disposition.

CPT ONLY - COPYRIGHT 2011 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

- If the agency receives the MRAN and continues to visit the client without contacting TMHP by telephone, mail, or fax within 30 days from the date on the MRAN, TMHP will provide coverage only for services provided from the initial date of contact with TMHP. The SOC date is determined accordingly. TMHP must have the MRAN before considering the request for prior authorization.

### 2.3.1.2 Benefits for Medicare/Medicaid Clients

For eligible Medicare/Medicaid clients, Medicare is the primary coinsurance and providers must contact Medicare first for prior authorization and reimbursement. Medicaid pays the Medicare deductible on Part B claims for qualified home health clients.

Home health service prior authorizations may be given for HHA services, certain medical supplies, equipment, or appliances suitable for use in the home in one of the following instances:

- When an eligible Medicaid client (enrolled in Medicare) who does not qualify for home health services under Medicare because SN care, PT, or OT are not a part of the client's care.

- When the medical supplies, equipment, or appliances are not a benefit of Medicare Part B and are a benefit of Home Health Services.

Federal and state laws require the use of Medicaid funds for the payment of most medical services only after all reasonable measures have been made to use a client's third party resources or other insurance.

> *Note:* *If the client has Medicare Part B coverage, contact Medicare for prior authorization requirements and reimbursement. If the service is a Part B benefit, do not contact TMHP for prior authorization. Texas Medicaid will only pay the coinsurance and deductible on the electronic crossover claim.*

TMHP will not prior authorize or reimburse the difference between the Medicare payment and the retail price for Medicare Part B eligible clients.

> *Refer to:* Subsection 4.13, "Third Party Liability (TPL)" in Section 4, "Client Eligibility" (*Vol. 1, General Information*).

### 2.3.1.3 Medicare and Medicaid Prior Authorization

Contact TMHP for prior authorization of Medicaid services (based on medical necessity and benefits of Home Health Services) within 30 days of the date on the MRAN.

> *Note:* *For MQMB clients, do not submit prior authorization requests to TMHP if the Medicare denial reason states "not medically necessary." Medicaid only will consider prior authorization requests if the Medicare denial states "not a benefit" of Medicare.*

Qualified Medicare Beneficiaries (QMB) are not eligible for Medicaid benefits. Texas Medicaid is only responsible for premiums, coinsurance, or deductibles on these clients. Providers should not submit prior authorization requests to the TMHP Home Health Services Prior Authorization Department these clients.

To ensure Medicare benefits are used first in accordance with Texas Medicaid regulations, the following procedures apply when requesting Medicaid prior authorization and payment of home health services for clients.

Contact TMHP for prior authorization of Medicaid services (based on medical necessity and benefits of Home Health Services) within 30 days of the date on the MRAN. Fax a copy of the original Medicare MRAN and the Medicare appeal review letter to the TMHP Home Health Services Prior Authorization Department for prior authorization.

> *Note:* *Claims for STAR+PLUS MQMB clients (those with Medicare and Medicaid) must always be submitted to TMHP as noted on these pages. The STAR+PLUS health plan is not responsible for these services if Medicare denies the service as not a benefit.*

CPT ONLY - COPYRIGHT 2011 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

# Appendix - 14

When the client is 65 years of age and older or appears otherwise eligible for Medicare such as blind and disabled, but has no Part A or Part B Medicare, the TMHP Home Health Services Prior Authorization Department uses regular prior authorization procedures. In this situation, the claim is held for a midyear status determined by HHSC. The maximum length of time a claim may be held in a "pending status" for Medicare determination is 120 days. After the waiting period, the claim is paid or denied. If denied, the EOB code on the R&S report indicates that Medicare is to be billed.

*Refer to:* Subsection 3.2.3, "Home Health Skilled Nursing Services" in *Nursing and Therapy Services Handbook* (*Vol. 2, Provider Handbooks*).

## 2.4 Claims Filing and Reimbursement

### 2.4.1 Claims Information

Providers must use only type of bill (TOB) 331 in Form Locator (FL) 4 of the UB-04 CMS-1450. Other TOBs are invalid and result in claim denial.

Home Health services must be submitted to TMHP in an approved electronic format or on a CMS-1500 or a UB-04 CMS-1450 paper claim form. Submit home health DME and medical supplies to TMHP in an approved electronic format, or on a CMS-1500 or on a UB-04 CMS-1450 paper claim form. Providers may purchase UB-04 CMS-1450 and CMS-1500 paper claim forms from the vendor of their choice. TMHP does not supply them.

When completing a CMS-1500 or a UB-04 CMS 1450 paper claim form, providers must include all required information on the claim, as TMHP does not key information from attachments. Superbills, or itemized statements, are not accepted as claim supplements.

*Refer to:* Section 3: TMHP Electronic Data Interchange (EDI) (*Vol. 1, General Information*) for information on electronic claims submissions.

Section 6: Claims Filing (*Vol. 1, General Information*) for general information about claims filing.

Subsection 6.6, "UB-04 CMS-1450 Paper Claim Filing Instructions" in Section 6, "Claims Filing" (*Vol. 1, General Information*).

Subsection 6.5, "CMS-1500 Paper Claim Filing Instructions" in Section 6, "Claims Filing" (*Vol. 1, General Information*) for instructions on completing paper claims.

Outpatient claims must have the appropriate revenue code and, if appropriate, the corresponding HCPCS code or narrative description. The prior authorization number must appear on the UB-04 CMS-1450 claim in Block 63 and in Block 23 of the CMS-1500 claim. The certification dates or the revised request date on the POC must coincide with the DOS on the claim. Prior authorization does not waive the 95-day filing deadline requirement.

#### 2.4.1.1 Benefit Code

Home health DME providers must use benefit code DM2 on all claims and authorization requests. All other providers must use benefit code CSN on all claims and authorization requests.

### 2.4.2 Reimbursement

DME and expendable medical supplies are reimbursed in accordance with 1 TAC §355.8021. Providers can refer to the Online Fee Lookup (OFL) or the applicable fee schedule on the TMHP website at www.tmhp.com. Providers may also request a hard copy of the fee schedule by contacting the TMHP Contact Center at 1-800-925-9126.

DME and expendable supplies, other than nutritional products, that have no established fee, are subject to manual pricing at the documented MSRP less 18 percent or the provider's documented invoice cost.

CPT ONLY - COPYRIGHT 2011 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

**Appendix - 14**

Nutritional products that have no established fee are subject to manual pricing at the documented AWP less 10.5 percent or at the provider's documented invoice cost.

For reimbursement, providers must note the following:

- Claims are approved or denied according to the eligibility, prior authorization status, and medical appropriateness.
- Claims must represent a numerical quantity of 1 month for supplies according to the billing requirements.
- DME/supplies *must* be provided by either a Medicaid enrolled home health agency's Medicaid/DME supply provider or an independently-enrolled Medicaid/DME supply provider. Both *must* enroll and bill using the provider identifier enrolled as a DME supplier. File these services on a CMS-1500 claim form.

    > ***Note:*** *Medical social services and speech-language pathology services are available to clients who are 20 years of age and younger and are not a benefit of Home Health Services. These services may be considered a benefit for clients who qualify for CCP.*

Texas Medicaid does not reimburse separately for associated DME charges, including but not limited to, battery disposal fees or state taxes. Reimbursement for any associated charges is included in the reimbursement for a specific piece of equipment.

> ***Refer to:*** Subsection 2.2, "Fee-for-Service Reimbursement Methodology" in Section 2, "Texas Medicaid Fee-for-Service Reimbursement" (*Vol. 1, General Information*) for more information about reimbursement.

Texas Medicaid implemented mandated rate reductions for certain services. The Online Fee Lookup (OFL) and static fee schedules include a column titled "Adjusted Fee" to display the individual fees with all mandated percentage reductions applied. Additional information about rate changes is available on the TMHP website at www.tmhp.com/pages/topics/rates.aspx.

## 2.4.3 Prohibition of Medicaid Payment to Home Health Agencies Based on Ownership

Medicaid denies home health services claims when TMHP records indicate that the physician ordering treatment has a significant ownership interest in, or a significant financial or contractual relationship with, the nongovernmental home health agency billing for the services. Federal regulation Title 42 CFR §424.22 (d) states that "a physician who has a significant financial or contractual relationship with, or a significant ownership in a nongovernmental home health agency may not certify or recertify the need for home health services care services and may not establish or review a plan of treatment."

A physician is considered to have a significant ownership interest in a home health agency if either of the following conditions apply:

- The physician has a direct or indirect ownership of five percent or more in the capital, stock, or profits of the home health agency.
- The physician has an ownership of five percent or more of any mortgage, deed of trust, or other obligation that is secured by the agency, if that interest equals five percent or more of the agency's assets.

A physician is considered to have a significant financial or contractual relationship with a home health agency if any of the following conditions apply:

- The physician receives any compensation as an officer or director of the home health agency.
- The physician has indirect business transactions, such as contracts, agreements, purchase orders, or leases to obtain services, supplies, equipment, space, and salaried employment with the home health agency.

CPT ONLY - COPYRIGHT 2011 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

# Appendix - 14